UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br><br>SAMUEL MAIGRET,<br>Defendant. | Case No. 21-CR-00123-MSM-LDA |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Court should sentence Defendant Samuel MAIGRET (MAIGRET or Defendant) to a term of imprisonment between 97-121 months, to be followed by a lengthy term of supervised release. The Government further requests that this Court set a date for final determination of restitution on a date on or before December 18, 2024, as is permitted under 18 U.S.C. § 3664(d)(5).[1]

I. PRESENTENCE REPORT

The Government does not object to the Guideline calculation in the Final Presentence Report.

However, the Government requests the following correction to paragraph 47 of the PSR, which will not change the Guideline calculation.

---

[1] The Government is continuing to receive requests for restitution from counsel of the Defendant's victims. As permitted under 18 USC 3664(d)(5), the Court may set a date for a final determination of restitution not more than 90 days from the date of sentencing, to afford the victims their rights and to afford the Defendant time to review the requests and make any objections. Defense counsel has advised that she does not object to a further date for determination of restitution.

1

Paragraph 47 of the PSR addresses the Grouping of Counts 1-4 and Counts 5-6, and states that the counts are grouped because the conduct of one Group is included as the specific offense conduct in the other, and that the Groups are therefore "Closely Related Counts" under U.S.S.G. § 3D1.2. PSR, ¶ 47 states that:

> Counts 1-6 are grouped for guideline purposes. Pursuant to USSG §3D1.2(c), when one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline application to another of the counts, they shall be grouped. In this case, Counts 1- 4 are grouped under (d); however, Counts 5 and 6, includes conduct that is treated as a specific offense characteristic to the guideline applicable to Counts 1-4. Furthermore, according to USSG §3D1.3(a), when counts are grouped pursuant to USSG 3D1.2(a)-(c), the offense level applicable to a group is the offense level for the most serious of the counts, namely, the group with the highest offense level which in this case is Counts 1-4, for a base offense level of 37.

The Government believes that the bolded language, which is the basis for a finding that the Counts were "Closely Related" and grouping of the counts, refers to the animal crush video involving the sexual torture and killing of the dog, that is described in paragraph 20 of the PSR (6th bullet point) and below ("dog torture video").

The dog torture video was the basis for a +4 enhancement for a depiction of sadistic, masochistic, or violent material in the calculation of the Offense Level applicable to Counts 5 and 6 (Group 2), which was calculated as a separate Group than the calculation of Counts 1-4 (Group 1). *See* PSR, ¶¶ 39-46 (calculation for Counts 5 and 6) and PSR, ¶¶ 28-37 (calculation for Counts 1-4). *See* PSR, ¶ 42.

The dog torture video was *not* the basis for an enhancement or considered as a specific offense characteristic in the guideline applicable to Counts 1-4 (Group 1). In the

PSR, the guideline calculation for Counts 1-4 (Group 1) correctly included a +4 enhancement under U.S.S.G. §2G2.2(b)(4)[2] based on the nature of the Defendant's CSAM collection, specifically because it included "material that portrays sexual abuse or exploitation of an infant or toddler. . . . [including] images and videos depicting prepubescent, toddler, and infant-aged children used for sexual acts, including bondage, with adult males and females, . . . ." PSR, ¶ 47. The dog torture video was *not* the basis for a specific offense characteristic in Counts 1-4.

Further, the Government contends that the harm to the children depicted in the CSAM, and harm to the animals tortured in the animal crush videos does not involve "substantially the same harm" which would support grouping under U.S.S.G. § 3D1.2. The crimes are separate and distinct. As this Court is aware, the offense conduct involving animal crush videos is not typically seen in CSAM cases.

The Government believes that the PSR should have instead first, calculated each offense level (as it did) under U.S.S.G. § 3D1.3. The PSR correctly calculated the Offense Level for Group 1 (Counts 1-4) as 37 and the Offense Level for Group 2 (Counts 5 and 6) as 18. *See* PSR, ¶ ¶ 37 and 46. Next, the PSR should be corrected to reflect that under U.S.S.G. § 3D1.4(a) and (c), the Offense Level for Group 1 (Counts 1-4), the group with the highest offense level should be used (as it was), without an increase for an additional

---

[2] U.S.S.G. 2G2.2(b)(4) provides for a +4 enhancement "[i]f the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler."

3

unit for Group 2 (Counts 5-6) because calculation for Group 2 (Counts 5 and 6) was 9 or more levels less serious than the offense level for Group 1

The Government recognizes that the requested change will not affect the Guideline calculation. However, the Government believes that this change will accurately reflect the lack of common harm and victims in the offenses in Counts 1-4 and Counts 5-6, and will correctly reflect that the Guideline calculation in this case was driven by the Defendant's conduct in Counts 1-4, and not increased by the Defendant' conduct in Counts 5-6.

II. SUMMARY OF OFFENSE CONDUCT

The Defendant was first identified as a collector of child sexual abuse material (CSAM) during an investigation into two TOR hidden service (dark web) websites that advertised CSAM material and offered full access to the CSAM website upon payment via cryptocurrency. In September 2021, after execution of a search warrant at his residence, the full scope of the Defendant's conduct was discovered. Investigators learned that in addition to his long-standing interest and efforts to collect and distribute CSAM, the Defendant had also been collecting and distributing videos of animals being tortured and killed, what are known as "animal crush videos." As described below, the Defendant admitted to a sexual interest in the children depicted in the CSAM and the animals shown in the animal crush videos.

First, as to the CSAM, when the Defendant's residence was being searched, he candidly admitted to having an interest in and to collecting CSAM. Among his admissions, the Defendant told investigators that:

- he had been interested in child pornography since he had been 14 years old, but had been "really getting into this" for the last 18 months;

- he masturbated to the child pornography images that he had obtained;

- he knew child pornography was illegal;

- he considered himself to be a pedophile;

- he preferred child pornography depicting younger children, under the age of 5 of 6 years old, and identified himself as having "nepiophilia," which is used to describe a sexual attraction to children under 5 years old;

- he searched for material on the dark web and had a Proton mail account, which he used because it was secure and anonymous, stating that he used the Proton mail account "to subscribe to websites on the dark web without it being traced back to [him];" and

- he traded child pornography with others using the Telegram and Wickr applications.

PSR, ¶ 16.

The Defendant's involvement with CSAM was not an isolated incident. *See* PSR, ¶ ¶ 18-20. In addition to the years that he collected CSAM, he was actively engaged with multiple Telegram users from at least November 2020 through August 2021, sending and receiving and sending CSAM with them. *See* PSR, ¶ ¶ 19-20. And, he intentionally collected and saved CSAM that was outside his interest to have available to trade with others. Representative *examples* of the Defendant's distribution of CSAM to other Telegram users show the depravity in the Defendant's conduct and include the following:

5

- On November 8, 2020, MAIGRET sent Telegram user [USER 1]" a video that showed an adult male masturbating and inserting his penis into the mouth of a crying infant.

- On December 18, 2020, MAIGRET sent Telegram user [USER 2] a video that showed an adult male forcefully inserting his penis into the mouth of a toddler. The adult male's hand is on the back of the toddler's head and is pushing the toddler's head, forcing his penis deeper into the mouth of the toddler.

    In addition, in the Defendant's last message to Telegram user [USER 2], he stated "*Nope that's all I got sorry. I love your stuff too.*"

- On February 2, 2021, MAIGRET sent Telegram user [USER 3] a video that showed an adult male inserting his penis into the anus of a nude infant.

- On July 9, 2021, MAIGRET sent Telegram user [USER 4] a video that showed an adult male inserting his penis into the anus of a nude prepubescent male.

PSR, ¶ 20. These examples are not the extent of the Defendant's distribution efforts. The *preliminary* forensic review showed that the Defendant distributed either CSAM or animal crush videos multiple times in a given month between November 2020 and August 2021. *See* PSR, ¶ 19.

The investigation also revealed that the Defendant had been collecting and distributing animal crush videos. Regarding the animal crush videos, during his interview, the Defendant told investigators said that:

- investigators would find "bestiality porn" which he said had "violence and murder of animals in a pornographic sense."

- he was sexually attracted to animals, and his preference is for dogs – preferably male dogs;

- He had been seeking out "animal pornography" for approximately 4 years.

6

- The investigators would find on his computer, and maybe his phone, of "somebody killing a dog in the woods by inserting things into it" . . . identifying the objects inserted into the dog as "a wooden spike, some dildos, and a few, a few other things."

PSR, ¶ 16.

Consistent with the Defendant's admission describing a video of a dog being killed, his Telegram activity showed that on July 10, 2021, he sent Telegram user [USER 5] an animal crush video that showed a dog that appeared to be a Rottweiler, tied to a tree stump with bungee cords. In the video, a male is violently inserting what appears to be a baseball bat, with the handle shaved down to a point, into the dog's vagina and anus. The baseball bat is covered in the dog's blood each time the individual pulls the bat out of the dog. Whoever is taking the video of this activity turns the camera to the dog's head/face multiple times during the two minutes plus video. The dog appears to be in severe distress throughout the video. At the end of the video, the dog is no longer moving, appears to be limp with no signs of breathing and appears to be deceased.

PSR, ¶ 20; ECF No. 38, Change of Plea Transcript, pp.17-18.

III. BRIEF HISTORY OF 18 U.S.C. § 48

The Defendant has pled guilty to Count 5, Distribution of Animal Crush videos. Insofar as this charge is not common in this District, the Government provides a brief history of the statute.

Section 48 of Title 18 of the United States Code was first enacted in 1999, with the goal of supplementing existing state laws prohibiting animal cruelty and addressing conduct, including the creation of animal cruelty videos, that may not have

been subject to prosecution under state law. *See* H.R. 106-397, Punishing Depictions of Animal Cruelty, in Exhibit 1, Excerpts of Legislative History for 18 U.S.C. § 48. In testimony on the proposed bill that became 18 U.S.C. § 48, witnesses described that the bill was necessary, in part, due to

> a growing market in videotapes and still photographs depicting insects and small animals being slowly crushed to death. While most of this material featured torture to mice, hamsters, and other small animals, their investigation did find depictions of cats, dogs, and even monkeys being tortured. . . . The witnesses explained that, through their investigation into the sale of these materials, they learned that these depictions often appeal to persons with a very specific sexual fetish who find them sexually arousing or otherwise exciting. The materials were commonly available through the Internet, and were almost exclusively distributed for sale through interstate or foreign commerce. Many Internet sites were blatant in offering to sell these depictions, and some even advertised to make such depictions to order, in whatever manner the customer wished to see the animal tortured and killed. . . .
>
> The committee also notes the increasing body of research which suggests that humans who kill or abuse others often do so as the culmination of a long pattern of abuse, which often begins with the torture and killing of animals. When society fails to prevent these persons from inflicting harm upon animals as children, they may fail to learn respect for any living being. If society fails to prevent adults from engaging in this behavior, they may become so desensitized to the suffering of these beings that they lose the ability to empathize with the suffering of humans. In either case, society's failure to require that living things be treated appropriately may lead some people to be more likely to act upon their desires to inflict harm upon those around them. In short, society has an interest in preventing any disregard for living animals. . . .

Exhibit 1, H.R. 106-397, Punishing Depictions of Animal Cruelty, pp.2-4.

In 2010, the Supreme Court ruled that Title 18, United States Code, section 48 was unconstitutional because depictions of animal cruelty could be protected speech. *See generally United States v. Stevens*, 559 U.S. 460 (2010) (the defendant operated a business

and a web site through which he sold videos of pit bulls engaging in dogfights and attacking other animals.) In *United States v. Stevens*, the Supreme Court held that section 48 was substantially overbroad to include prohibition of protected speech under the First Amendment. *Id.* at 480-81. However, the Court recognized the existence of the "animal crush video" genre where sexualized torture and killing of helpless animals were depicted and marketed, and reserved the question of "whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional." *Id.* at 482.

In December 2010, in the wake of the *Stevens* decision and having identified an increase in the "market" for animal crush videos, Congress passed the Animal Crush Video Prohibition Act of December 2010 ("the ACVPA") to revise Section 48 to prohibit the creation and distribution of "animal crush videos" that were obscene. In hearings on the ACVPA bill, when considering the need for the legislative, the House Committee on the Judiciary reported that:

> it has learned that a robust market for crush videos reemerged on the Internet in light of the Supreme Court's invalidation of section 48.15 As was the case when Congress first attempted to address the problem of trade in crush videos, these videos are again being created for sale to those with a sexual fetish and for whom depictions of animal cruelty are arousing.

*See* H.R. REP. 111-549, at *5, Prevention of Interstate Commerce in Animal Crush Videos Act of 2010, within Exhibit 1. With certain exceptions, Section 48(f)(1) defines "animal crushing" as "actual conduct in which one or more living non-human mammals, birds, reptiles, or amphibians is purposely crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury." The ACVPA's revised prohibitions on the

9

creation and distribution of animal crush videos currently are set forth in sections 48(a)(2) and (3), and the revised definition of "animal crush video" is found in § 48(f)(2).

Most recently, in 2019, Congress enacted the Preventing Animal Cruelty and Torture Act ("the PACT Act"), to add a new provision to Section 48, prohibiting animal crushing itself, regardless of whether such crushing was "obscene." Pub. L. No. 116-72 (Nov. 25, 2019). That prohibition is now codified at § 48(a)(1). Specifically, it is now "unlawful for any person to purposely engage in animal crushing in or affecting interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 48(a)(1).

The statutory maximum penalty for all violations of Section 48 is seven years in prison. 18 U.S.C. § 48(c).

## IV. SENTENCING RECOMMENDATION

### A. The Nature and Circumstances of the Offenses.

The extreme and disturbing nature of MAIGRET's conduct is difficult to overstate. First, as to CSAM offenses, his interest and use of CSAM is extensive, intentional, and offensive in the extreme. His admissions and the evidence from his devices show that the Defendant is sexually attracted to young children; that for years, has actively sought out images of children, including infants and toddlers, being sexually abused; that he uses this images to become sexually aroused and to masturbate; and that he shares the images with other users of CSAM, thereby furthering the abuse of these children and the market for CSAM. The Defendant's efforts to collect CSAM spanned years and by his admission,

were done, at least in part, in a manner to prevent others from identifying him. Further, the Defendant intentionally sought out and saved CSAM that weren't his preferred type so that he would have it available to trade with others. In addition to his victimization of the children depicted in the approximately 3,000 videos and images he collected, the Defendant has also acted on his interest in viewing the sexual abuse and killing of animals. The Defendant's conduct as to the animal crush videos show more than a disregard for animal life or as he claims, a sexual interest in animals, it shows a candid and troubling craving for violence.

The images and videos that the Defendant sought out and used for his masturbatory pleasure should not be casually regarded, as the Defendant describes them, as types of "porn." These images show the violent sexual abuse of children and the violent sexual abuse and killing of animals. The sentence should reflect that this Defendant's conduct falls on the extreme end of conduct of this type, given the length of time he collected and distributed this materials; his intentional efforts to collect these vile images and videos using technology to limit law enforcement's ability to identify him; his efforts to cater to the larger child pornography community by collecting a variety of CSAM; his chosen age range of his victims in CSAM; his prodigious distribution of this material; and his choice to seek out, use, and share the violent abuse of animals.

B. <u>The Need to Reflect the Seriousness of the Offenses</u>.

The Defendant has been a long-standing and active participant in communities of deviant individuals who revel in watching the sexual abuse of young and vulnerable

children and the torture and abuse of animals. By his actions, the Defendant has been part of the continuing suffering and exploitation of the children depicted in the CSAM images and videos, and similarly, of the animals. His sexual interest and need to collect what he knew to be illegal material continued, not only directly caused harm and suffering to the depicted children, but also fueled the market for the creation of CSAM. As the Seventh Circuit Court of Appeals has found:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded – both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.

*United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) (citations omitted). The same argument would apply to the animal crush videos.

The First Circuit has also repeatedly found that a collector of child pornography does contribute to the ongoing abuse of children and proliferation of the market for CSAM. *See United States v. MacVicar*, 96 F.4th 51, 58 (1st Cir. 2024) (affirming an 84-month sentence for possession of a child pornography conviction for a first-time offender, finding that "[t]he heinous impact of the child pornography market on society cannot be understated, nor can the defendant's place in that market."); *United States v. Gomera-Rodriguez*, 952 F.3d 15, 20 (1st Cir. 2020) (97-month term of incarceration for possession of

child pornography was substantively reasonable as means of deterring demand and thereby tamping down supply); *United Hassan-Saleh-Mohamad*, 930 F.3d 1, 9 (1st Cir. 2019) (affirming 87-month sentence for possession of child pornography conviction for first time offender; finding that "[b]y accessing child pornography with intent to view it, [a] defendant contribute[s] to the continued viability of this highly exploitative market." ) (quotations omitted) (citing *United States v. Blodgett*, 872 F.3d at 71 and *United States v. Gall*, 829 F.3d 64, 75 (1st Cir. 2016)). *See also United States v. Colcord*, 90 F.4th 25, 31 (1st Cir. 2024) (affirming 145-month sentence for possession of child pornography conviction for repeat sex offender; finding that "Congress has recognized that reducing the demand for this exploitative market is as necessary as reducing the supply . . . We add, moreover, that the defendant's attempt to downplay the severity of his conduct because he was a viewer of vile material, not a producer or distributor of it, is unpersuasive.") (citing *United States v. Blodgett*, 872 F.3d 66, 71 (1st Cir. 2017)) (quotations omitted).

Specific to the Defendant's collection of, use of, and distribution of animal crush videos, the sentence must also reflect that this Court views the distribution of animal crush videos – and more specifically, the Defendant's decision to spread his passion for viewing animal torture – as serious, criminal conduct.

C. <u>The Need to Afford Adequate Deterrence</u>.

Courts have repeatedly recognized that deterrence and punishment should be primary factors in fashioning child pornography sentences. *See e.g.*, *Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is surely reasonable for the State to conclude that it will

decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand."); *United States v. Lichtman*, 683 Fed. Appx. 873, 879 (11th Cir. 2017) ("A strong consideration in weighing the seriousness of [possession and distribution offenses] is that those who receive and exchange child pornography create a demand that influences the production of the pornography and the attendant physical and emotional injury to children."); *United States v. Ellison*, 113 F.3d 77, 81 (7th Cir. 1997) (observing that "even the receipt of [child pornography] for personal use, without more, keeps producers and distributors of this filth in business.").

The lengthy period over which the Defendant showed and acted on his sexual interest in children and his interest in animal torture suggest that specific deterrence will be an uphill challenge. However, the Defendant's efforts to seek and his participation in counseling weigh in his favor in that regard. The Government hopes that the Defendant's efforts to understand and learn tools to stop his criminal behavior continue while serving his sentence and upon his release. However, the sentence imposed should be a reminder to the Defendant that if he continues with the conduct that has apparently consumed his life for years, he will face additional, serious penalties. In addition to specific deterrence, general deterrence should be a goal of this sentencing. The sentence in this case must send a loud message to not only this Defendant but also to other offenders, that serious consequences will result for such callous disregard of each set of the victims harmed by the Defendant.

14

D. <u>Need to Protect the Public from Further Crimes of the Defendant</u>.

Although no one can predict the Defendant's future behavior or know whether the Defendant will ever physically abuse a child, the Court should find that he does pose a threat to the public and his sentence should reflect a need to protect the public. This Court does know that: the defendant has a long-standing sexual interest in children and animals; that he continued to collect and distribute the images at issue despite knowing they were illegal; that he has displayed a long-standing and troubling lack of empathy for the harm and pain inflicted on the children and animals in the materials he collected; that he lacks impulse control. Further, the defendant's threat to society is not limited to a concern that he may move on from collecting and distributing to physically molest a child. Rather, as recognized by courts nationwide, every time the Defendant viewed a CSAM image or video and/or distributed an image and video, he victimized the depicted children and contributed to the lifetime of anguish these children have and will continue to endure.

> The Supreme Court has repeatedly explained, for thirty years, that individuals depicted in child pornography are harmed by the continuing dissemination and possession of such pornography containing their image. Such materials are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Indeed, the Court has stated that as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated. Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being. These statements were well supported by medical and social science.

*United States v. Kearney*, 672 F.3d 81, 94 (1st Cir. 2012) (internal citations and quotations omitted). The Defendant's sentence should address the need to protect the public, whether those victims are online or accessible to the Defendant by virtue of geography.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court sentence the Defendant to the recommended sentence.

Respectfully submitted,

ZACHARY A. CUNHA,
United States Attorney

*/s/ Denise M. Barton*

_____
DENISE MARIE BARTON
Assistant U.S. Attorney
One Financial Center Plaza, 17th Floor
Providence, RI 02903
Email: denise.barton@usdoj.gov
Tel: 401-709-5000
Fax: 401-709-5001

## CERTIFICATE OF SERVICE

      I hereby certify that on September 17, 2024, the within "GOVERNMENT'S SENTENCING MEMORANDUM" was filed electronically and is available for viewing and downloading from the ECF system.

 

_____
Denise Marie Barton
Assistant U.S. Attorney